UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENVER LEE,

                Petitioner,                        Case Number 18-20198

v.                                        Civil Case Number 21-10326

                                            Honorable David M. Lawson

UNITED STATES OF AMERICA,

                Respondent.

_____/

**OPINION AND ORDER DENYING IN PART MOTION TO VACATE SENTENCE
AND SCHEDULING EVIDENTIARY HEARING,
AND DENYING MOTION FOR BOND**

Defendant Denver Lee challenges his 15-year prison sentence imposed under the Armed Career Criminal Act (ACCA) after a jury convicted him of possessing a firearm as a convicted felon. In his motion to vacate his conviction and sentence, he alleges several procedural and substantive errors that either were or could have been raised on direct appeal. Those claims are forfeited and cannot provide a basis for relief. Lee also asserts that his trial and appellate counsel were constitutionally ineffective on a variety grounds. Some of those grounds are meritless, but others will require an evidentiary hearing to resolve. Therefore, the Court will deny in part Lee's motion to vacate his sentence and schedule an evidentiary hearing to address the remaining claims. The Court will not release Lee on bond pending the adjudication of the remaining issues in this motion.

I. Facts and Proceedings

A. Trial Evidence

On the evening of February 15, 2018, around 9:00 p.m., four officers of the City of Detroit police department were on patrol in a neighborhood near Sunderland Road and Seven Mile Road in Detroit. The officers attested that they knew this to be a "high crime area" of the city. They

saw two cars parked next to each other in the middle of Sunderland, one facing north and one facing south, and they approached the cars to inform the drivers that they were blocking traffic.

As they approached, the officers saw a driver seated in each car and two men, one of whom was defendant Denver Lee, standing in the street between the cars. The officers observed that the gathering of men and cars was preventing other vehicles from passing. As the police approached the group, Officer Darrell Brents turned his patrol car's searchlight on them. Brents's version of the events is that he observed Lee look toward the police cruisers with a "wide-eyed nervous expression," then clutched at the front center pocket of the sweatshirt that he was wearing and quickly walked north, away from the police cruiser, looking back at the officers as he walked. Brents testified that Lee's walk appeared suspicious, as if he were hiding something, and Brents believed that Lee might be about to run from the officers. Brents stepped out of his patrol car, along with the other officers, and began to follow Lee, while the other officers approached the persons who were still near the parked cars.

As Brents approached Lee near the front of one of the cars, Lee turned toward him. The scout car's light was still illuminating Lee. Brents saw Lee still clutching the pocket of his hooded sweatshirt, still with the same wide-eyed and nervous expression. At that point, Brents was around five or six feet from Lee, and as he observed Lee's pocket, he saw a heavily weighted bulge in the pocket where Lee was grabbing. Brents believed the bulge to be a firearm, and he frisked Lee, feeling the outside of the sweatshirt pocket. He immediately felt an object that he recognized as a gun; he then reached into the pocket and recovered a Smith & Wesson Bodyguard .380 caliber handgun, loaded with 6 live rounds. Brents testified at trial that he located and retrieved the subject weapon directly from Lee's sweatshirt pocket:

> Q. And when you did that patdown, did you feel the area of that weighted bulge you had seen before?

A. Yes, sir.

Q. And could you identify what that item was?

A. Immediately identified it to be a handgun.

Q. How did you know that?

A. Just experience.

Q. Have you frisked people before in patrol?

A. Yes, sir.

Q. How many times?

A. Numerous. I can't give an accurate answer on that.

Q. And have you felt firearms through a pocket like that before?

A. Yes, sir.

Q. When you recognized the item was a firearm, what did you do next?

A. Well, I immediately notified my partners that Mr. Lee was armed and I reached into the pocket and retrieved the weapon.

Trial Tr., Vol. II, ECF No. 41, PageID.421.

Lieutenant Willie Duncan corroborated Brents's testimony and stated that, while standing beside Lee and holding Lee's arm, he observed Brents recover the weapon from Lee's sweatshirt pocket:

A. I grabbed Mr. Lee by his right arm. I was holding his arm. I observed Officer Brents grab a handgun from his front pocket, hoody pocket. I placed him in handcuffs. And once Mr. Lee was secured and handcuffed, I immediately went back to talk to the driver of the vehicle.

Q. And I want to take that step-by-step just a little bit. So when you first arrived, had Officer Brents already recovered a gun from Mr. Lee?

A. No. He was recovering it. He recovered it once I was already there.

Q. Okay. And did you see him actually reach into Mr. Lee's pocket and recover that gun?

A. I saw him coming out of his pocket with a handgun, yes.

Q. Okay. Do you remember which hand he was using when he recovered it?

A. His left hand.

Q. What kind of gun was it that he recovered?

A. It was a blue steel automatic.

Trial Tr., Vol. II, ECF No. 41, PageID.506.

Finally, Officer Shaun Dunning also testified that he observed Brents recover the gun from

Lee's pocket. When asked what Dunning did as he approached the parked vehicles at the scene,

Dunning stated:

A. I immediately went to Mr. Denver Lee. He had a coffee cup in his hand. I removed the coffee cup and put it to the ground. And at that point I assisted Lieutenant Duncan with arresting the defendant.

Q. Did you see anything as you were walking towards the defendant?

A. I did. I observed Officer Brents motioning towards his left side as if he was pulling out and away a firearm, away from Mr. Denver Lee.

Q. Did you ever see a firearm that evening?

A. I did. I saw a black small caliber firearm, later to be known as a black Smith & Wesson .380 caliber.

Trial Tr., Vol. II, ECF No. 41, PageID.529-30.

The government introduced in evidence video recordings from the officer's body and dash

cameras.  The videos were not clear, but they did not plainly contradict the officers' testimony.

Lee testified on his own behalf at trial, denying that he at any time possessed a firearm.  He

acknowledged that he was present on Sunderland Steet that evening, explaining that he was

meeting an employee, Lena Safadi, who was to give him some cash.  Lee said that when he arrived,

both cars were in the street. One of them was driven by Safadi.  She was in her car when she

handed him the cash.  The handgun that the police maintain was seized from Lee was registered

to Safadi.  Lee said that he did not see a handgun in her car, and he never took possession of a gun from her.  Instead, the police arrived suddenly, shined a light on him, and put him in handcuffs.

### B. Trial Counsel's Conduct

In a supplement presented by his appointed counsel, Lee discusses several aspects of his trial representation that allegedly were deficient, and he describes circumstances that allegedly explain the poor performance by his trial counsel, Wright Blake.

First, Lee says that at a motion to suppress hearing Blake should have impeached the police officers who testified by asserting that the sweatshirt the defendant was wearing was black in color, not blue.  However, despite obtaining two continuances of the hearing to different dates, Blake was unprepared and failed to bring the sweatshirt to present as evidence.

Second, Lee says that body camera footage from the scene showed that Lee never dropped a coffee cup which he was holding in his hand.  Officer Brents had testified that Lee was startled and dropped the cup, which was part of the information Brents relied on to formulate his reasonable suspicion to support the pat down.  Lee says the footage shows that the cup was knocked out of Lee's hand by another officer, but Blake was not able to use that footage for impeachment because he had not watched the video before the suppression hearing.

Third, Lee says that, on August 5, 2018, Blake was arrested for third-offense operating while under the influence, and that his arrest and detention on that felony charge likely explain why he failed to appear for a scheduled hearing date on August 6, 2018.  Blake eventually pleaded no-contest to a reduced misdemeanor charge and consented to reprimand by the State Bar of Michigan in February 2022.  Lee was unaware of Blake's substance abuse issue or the pending charges during his trial.

Fourth, Lee's appointed counsel retained an investigator who located and interviewed a witness, Bennie Blakely, who is a prisoner presently in the custody of the Michigan Department

of Corrections.  Blakely told Lee's investigator that he was the driver of the other car at the scene in February 2018.  The investigator attested that Blakely further stated that the police did not take a gun from Lee's person during the arrest.  Desiree Edwards aff., ECF No. 189-2, PageID.2397 ("Blakely said the police did not pat Lee down. Blakely said it's possible the cops 'planted' the gun.  He said, 'Denver was in plain sight.  He was on the hood of my car.  They didn't pat him down and they didn't take no gun off him.'").  Blakely indicated that he would have testified at trial, but he never was contacted by attorney Blake.

Fifth, Lee's counsel also located and interviewed Crystal Brown, who stated that she has known the defendant for 10 years and was willing to testify about Lee's character.  Ms. Brown evidently was willing to testify at trial and may have appeared in Court on October 17, 2018, but Blake decided not to call her.

Sixth, Lee says that after the government rested, Blake initially indicated to the Court that Lee would not testify, but less than one hour after that indication Lee took the stand in his defense. Lee says that Blake did nothing to prepare him to testify before he took the stand, either by preparing other witnesses to support his testimony, or by discussing Lee's own testimony in advance.  Lee says Blake knew that he never had testified at trial before, because Blake represented him in earlier proceedings that all were resolved by guilty pleas.

Finally, Lee says that during an April 6, 2021 telephone interview with the government attorneys on the case, John Meixner and Hank Moon, Blake admitted all of the following circumstances: (1) on October 17, 2018, Lee told Blake that he was "high," (2) Blake knew that Lee smoked marijuana on a "daily" basis, (3) Blake told Lee not to testify, (4) Blake did not prepare Lee to testify, and (5) the entire discussion about whether Lee would testify only took around 15 minutes prior to Lee taking the stand.

## C. Defendant's Mental Condition

Lee says that he told Blake that he had mental health and substance abuse issues throughout the trial proceedings. He points to Wayne County Jail records disclosing that, on October 18, 2018, when he was taken back to the jail, he reported that he had used marijuana and promethazine with codeine. He also stated to jail personnel that he was hallucinating during the trial, that he saw persons in the courtroom speaking to him who were not there, and that throughout the trial he "saw 'purple dragons about the size of babies' flying around the courtroom, at times chewing on the trial judge's head." *See* Report of Dr. Jeffrey Wendt dated July 16, 2019 (previously accepted by the Court at the post-trial competency hearing). Lee says that although he was found to be competent during a post-trial competency hearing, that determination was made after he had been incarcerated and medicated for some time following the trial.

## D. Proceedings

The indictment in this case, which charged Lee with possessing a firearm after having been convicted of a felony, contrary to 18 U.S.C. § 922(g)(1), included a charging enhancement under 18 U.S.C. § 924(e) for the defendant's alleged status as an armed career criminal. The defendant filed a motion to suppress evidence of the gun retrieved during the pat down encounter, arguing that (1) the officers had no warrant and no probable cause to arrest the defendant for violating any criminal statute or ordinance based on the observation that his vehicle was "impeding traffic," and (2) the circumstances of the encounter did not supply any reasonable suspicion for the stop and frisk. The Court denied the motion. The case was tried to a jury, which returned a guilty verdict on October 19, 2018.

On November 19, 2018, the defendant, through his trial counsel, filed a motion for judgment of acquittal on the ground that the trial evidence was insufficient to sustain a conviction. The Court denied that motion in an opinion issued on January 17, 2019. *United States v. Lee*, No.

18-20198, 2019 WL 244789, at *1-3 (E.D. Mich. Jan. 17, 2019), *aff'd*, 834 F. App'x 160, 2020 WL 6441164 (6th Cir. 2020).   On December 10, 2018, the defendant retained new counsel who appeared on his behalf and sought more time to file a motion for a competency hearing and a second motion for a new trial.   Defendant's trial counsel, Wright Blake, was permitted to withdraw on February 21, 2019.   On April 25, 2019, the defendant's new lawyer filed a motion for a competency hearing, and on August 6, 2019, with leave granted, he filed a second motion for a new trial under Federal Rule of Criminal Procedure 33, arguing that the defendant's trial counsel was ineffective.   On September 3, 2019, the Court held a competency hearing and heard oral argument on the defendant's second motion for new trial.   At the conclusion of the hearing the Court issued rulings from the bench finding that the defendant was competent then and at the time of trial.   The Court also held that the ineffective assistance issue was not properly presented in a new trial motion but should instead be raised on collateral review.   *See* Order, ECF No. 85 (Sept. 3, 2019); *United States v. Lee*, 834 F. App'x 160, 163 (6th Cir. 2020) ("[U]pon finding that the record was not fully developed and that under Sixth Circuit precedent 'the question of ineffective assistance of counsel ought to be raised on collateral review,' the court denied the motion (though the court noted that Lee could later raise the issue in a 28 U.S.C. § 2255 motion).").

On September 9, 2019, the Court sentenced Lee to a below guidelines, mandatory minimum term of 180 months in prison.

Lee appealed his conviction and sentence and presented several claims of error.   First, Lee argued that the Court erred by admitting evidence of his 2005 conviction for illegal firearm possession.   Second, the defendant presented a series of arguments hinging on the Supreme Court's intervening decision in *Rehaif v. United States*, --- U.S. ---, 139 S. Ct. 2191 (2019), where the Court held that in order to secure a conviction "under 18 U.S.C. § 922(g) . . . , the Government

- 8 -

must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm," *id.* at 2200.  Based on the outcome in *Rehaif*, the defendant argued that "(1) his indictment was faulty, (2) his conviction was based on an improper variance or constructive amendment, (3) the district court lacked subject-matter jurisdiction because no federal offense was charged due to the faulty indictment, (4) the jury instructions were improper, and (5) there was insufficient evidence to support his conviction." *Lee*, 834 F. App'x at 165.  Finally, Lee argued that this Court erred by refusing to hold a post-trial evidentiary hearing on his ineffective assistance claim and denying his second motion for new trial without prejudice to reassertion of the claim in a collateral attack under 28 U.S.C. § 2255.  The Sixth Circuit rejected all of those arguments and affirmed the conviction and sentence.

On January 29, 2021, Lee filed a *pro se* motion to vacate his conviction and sentence under 28 U.S.C. § 2255, arguing that his trial and appellate lawyers were ineffective in several ways, and also reasserting claims of error based on *Rehaif*.  The Court appointed counsel, who engaged in fact development and filed a supplemental brief focusing on the ineffective assistance claims.

The present section 2255 motion raises several arguments to support Lee's contention that he was denied the effective assistance of counsel.  Those arguments have been well developed by his newly appointed counsel.  Lee also had submitted a motion without his attorney's assistance reasserting the claims that the conviction is defective under *Rehaif*.  On his own initiative, Lee subsequently filed 10 further submissions, some of which sought relief such as judgment by default, summary judgment, and sanctions for purported procedural missteps by the government. The Court construes those papers as amendments or supplements in support of the opening motion. In his supplementary filings, Lee raised the following additional claims besides those discussed above: (1) the government engaged in "selective prosecution" by only charging the defendant, an

African-American male, and not charging any crimes by his white female "assistant," Lena Safadi, despite the fact that the gun recovered was registered in her name, and that it presumably was given to Lee by her, if in fact Lee possessed it, (2) the government presented "false evidence" and "perjured testimony" by officers to the effect that Lee was "blockading traffic," when his conduct at the scene did not violate any applicable local law or ordinance; and that Lee "dropped a coffee cup," when the body cam footage shows that he never dropped the cup, and (3) evidence of the gun was illegally obtained because the officers at the scene had neither probable cause nor reasonable suspicion to search Lee's person.

II.

The Court will address Lee's potpourri of assorted issues before turning to the ineffective assistance of counsel claims.

A.

It is well accepted that a federal defendant challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). And he "must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998) (holding that "even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first

- 10 -

challenged on direct review"); *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (reaffirming that "[s]ection 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process"). Moreover, when a defendant fails to raise an issue at trial or on direct appeal, that issue is generally forfeited. *See Huff v. United States*, 734 F.3d 600, 605-06 (6th Cir. 2013).

Lee's miscellaneous claims all fall within the forfeiture rule, because they could have been raised on direct appeal but were not, and a claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998); *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003); *Huff v. United States*, 734 F.3d 600, 605-06 (6th Cir. 2013).

Lee's attempts to resurrect the various *Rehaif*-based claims of error, which he says constitute "structural error" in the trial, meet the same fate for a different reason. The Sixth Circuit already has considered and rejected the same arguments on direct appeal. It also has rejected the position that defects relating to *Rehaif*'s knowledge element constitute structural error. *United States v. Lee*, 834 F. App'x 160, 163 (6th Cir. 2020) (citing *United States v. Watson*, 820 F. App'x 397, 400 (6th Cir. 2020) ("In *United States v. Hobbs*, 953 F.3d 853 (6th Cir. 2020), [] we held that a defendant who pleads guilty must show prejudice from a district court's failure to explain *Rehaif*'s knowledge-of-status element. We nowhere suggested that such a failure could qualify as structural error. Watson's argument is incompatible with *Hobbs*.") (citing *Ruelas v. Wolfenbarger*, 580 F.3d 403, 410-11 (6th Cir. 2009); *United States v. Stewart*, 306 F.3d 295, 318–23 (6th Cir. 2002)).

These arguments cannot support relief under section 2255, and the motion on those bases will be denied.

- 11 -

B.

A claim that otherwise would be forfeited may be raised through a collateral attack under section 2255 if a defendant "can demonstrate cause and prejudice to excuse his default." *Id.* at 606. "Ineffective assistance of counsel can constitute cause for a procedural default." *Ibid.* Furthermore, a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). And a claim of ineffective assistance of counsel itself is properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). One way of establishing deficient performance is to show that defense counsel missed a meritorious argument under the controlling law. However, the failure to file a meritless motion or raise a groundless objection does not constitute deficient performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (noting that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

- 12 -

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In a federal habeas proceeding, no evidentiary hearing is required where the record "conclusively shows" that the defendant is not entitled to relief. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018).. Otherwise, a hearing is "mandatory." *Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (citing *Fontaine v. United States*, 411 U.S. 213, 215 (1973)). The hearing, though, need not be "full blown"; instead, it can be "tailored to the specific needs of the case." *Ibid.* (quoting *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993). Some of Lee's contentions are fact-bound and require a hearing to resolve. Others, discussed below, can be decided on the motion papers.

### 1. Basis for Investigatory Stop

First, Lee says that Blake failed adequately to challenge the basis of the investigatory stop, and in particular that Blake was unprepared to argue that there was no legal basis for the police to investigate or seize Lee on the street, because the observed conduct did not constitute a violation of any pertinent municipal ordinance. That position, however, was addressed by the Court and rejected when it ruled on the motion to suppress, finding that regardless of whether any apparent legal infraction was in progress when the officers reached the scene, there was no constitutional violation in merely approaching to question the persons whom they observed standing near and occupying parked vehicles on a public street.

The contention that there may not have been any criminal activity in progress is immaterial to the legality of the investigative stop because, contrary to the defendant's position, police are not required to have reasonable suspicion of a crime in order merely to approach a citizen in a public place. As the Supreme Court has explained, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). The Court explained that "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Ibid.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). This well-established jurisprudence derives from *Terry v. Ohio*, 392 U.S. 1 (1968), where the Court explained that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. at 19 n.16 (cleaned up).

When it ruled on the motion to suppress, this Court explicitly rejected the notion that any reasonable suspicion was needed for the initial approach to the group of people which officers spotted loitering in the roadway. *See* Hr'g Tr., ECF No. 26, PageID.201-04. The Court found that it was entirely the petitioner's conduct that was observed during and after the initial approach that gave rise to reasonable suspicion that justified the ensuing stop-and-frisk. Because the initial approach by officers did not require reasonable suspicion, the petitioner's position that reasonable suspicion of a traffic violation was lacking is simply immaterial to the analysis, and Blake cannot be faulted as ineffective for failing to pursue a groundless legal argument.

## 2. The "Blue" Sweatshirt

Second, Lee argues that Blake was ineffective by failing to bring to the suppression hearing a "black sweatshirt" that Lee allegedly provided to him, telling Blake that it was the sweatshirt he was wearing when he was arrested. The evidentiary basis of this claim, however, is belied by the body camera video that clearly shows that the sweatshirt Lee wore was blue, not black. *See* Still Image dated Feb. 15, 2018, ECF No. 122, PageID.2038. Moreover, Lee's claim also is contradicted by his trial testimony that the sweatshirt was blue, not black. Trial Tr. Vol. II, ECF No. 41, PageID.560 ("MR. BLAKE: Okay. Now, what did you have on that day? DEFENDANT: I had a Louis Vuitton scarf and a — I think like a blue Armani sweater. And I can't remember if I had on jeans or sweats."). Nonetheless, Lee alleges that Blake failed to review the body cam video before the suppression hearing, and the record is unclear on that point; Blake's testimony will be required to clarify the record. The failure of counsel to prepare properly to address an evidentiary issue of some importance may constitute deficient performance. On the other hand, if Blake did view the video at some point and observed that the recording showed the defendant's sweatshirt to be blue, then it would have been a reasonable strategic choice to decline the defendant's urging to present evidence plainly in contradiction with the video record. A hearing is required to adjudicate the issue.

## 3. The Coffee Cup

Third, as noted above, Lee argues that Blake failed to review the body camera footage before the hearing, and as a result he failed to point out portions of the video that showed, contrary to Officer Brents's testimony, that Lee never "dropped" the coffee cup that he was holding, which Brents attributed to a desire to flee, purportedly adding to the basis of his suspicion. The

government says, based on a post-trial interview with Blake, that he will testify that he did in fact review the body camera footage with Lee before the hearing.

Moreover, as the government points out, the record shows that Blake did not fail to make any effort to raise the issue of the coffee cup, but instead merely had technical difficulties making a record because he assumed that the government or the Court would have equipment available to play the footage during the hearing. Nevertheless, Blake did present to the Court a still image from the video, which the Court accepted as showing the defendant holding a coffee cup during the encounter with Officer Brents. *See* Hr'g Tr., ECF No. 26, PageID.182. And counsel and the Court discussed the still image, which depicted Lee holding the cup, contrary to Brents's testimony that he dropped it when officers approached. *See id.* at PageID.189-90 ("THE COURT: I'll give you this, Mr. Blake, looking further with your explanation it looks like there is a cup with either a hand or some fingers around it in the lower middle part of this photocopy that you have presented. MR. BLAKE: Yes, your Honor. And it's up under Shawn Dunning's body cam, which is captioned on the upper left-hand corner. THE COURT: All right. MR. BLAKE: So it is Shawn Dunning who is approaching Mr. Lee and taking the cup out of his hand and that's clearly shown on the video."). The Court acknowledged the inconsistency in its ruling on the motion. *Id.* at PageID.201 ("[T]hen we had the testimony of Darrell Brents today, who was recalled, and there is a challenge as to whether or not the defendant actually dropped the coffee cup or whether he had it in his hand when he was approached."). The Court, however, found the dispute over the coffee cup was not material to the outcome, because other factors in the defendant's conduct still justified the pat-down search. *Id.* at 203 ("The cases that the government cited, *Bell*, which is unpublished, and *Jones*, which is published, contain facts that are quite similar to the scenario that was described by Officer Brents in this case, *discounting the idea that the defendant had a coffee cup in his hand and dropped it*

*out of nervousness or an intention to flee.*") (emphasis added).  Blake cannot be faulted for failing to attempt an impeachment which the record shows he did in fact present to the Court, and which was accepted by the Court and found merely to be immaterial to its decision to deny the suppression motion.  No hearing is required on this question.  Attorney Blake did not perform deficiently by presenting the impeaching evidence as he did.

4.  Failure to Investigate

Fourth, Lee contends that Blake was ineffective by failing to locate and interview Bennie Blakely, who, Lee says, would have testified at trial that he was present during the entire incident and saw that police never removed a gun from Lee's person during the arrest.  The record is incomplete on this point and the government has not responded to the petitioner's offer of proof, which was included in a supplement that post-dated its response.  This claim is troubling because the witness allegedly would have provided testimony tending directly to exculpate Lee.  The evidentiary basis of the claim is hard to evaluate without Blake's testimony about whether he was informed about Blakely, and if so why he decided not to pursue him as a witness.  It also is important to hear from Blakely to determine, among other things, prejudice.

It is well settled that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Rayner v. Mills*, 685 F.3d 631, 640 (6th Cir. 2012) (citing *Strickland*, 466 U.S. at 691).  But when evaluating counsel's decisions whether to investigate, a court must "apply[] a heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (citing *Strickland*, 466 U.S. at 690-91).  When the petitioner predicates an ineffective-assistance-of-counsel claim on a failure to call a witness, he must provide the substance of the missing witnesses' potential testimony. *Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007).  Otherwise, the petitioner cannot establish that his

counsel performed deficiently or that he was actually prejudiced. *Ibid.* (citing *Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006)).

A hearing is necessary to determine the ineffective-assistance-of-counsel question as to potential witness Blakely. Lee also contends that Blake failed to locate and interview other witnesses to present at trial, but he has made no presentation about who those supposed witnesses were or what the substance of their testimony might have been. It is unlikely that he can prevail on any claim that additional witnesses were not located or investigated, absent some competent evidentiary presentation about what their trial testimony would have comprised. *See Ray-El v. Schiebner*, No. 18-13037, 2023 WL 2393629, at *8 (E.D. Mich. Mar. 6, 2023). This question must abide the proofs.

### 5. Admissibility of Convictions

Fifth, Lee argues that Blake was ineffective by failing to file any pretrial motion *in limine* and failing adequately to present any contemporaneous objection to the admissibility of his prior convictions. Notably, the focus of this argument is on the admissibility of Lee's prior conviction for gun possession, which the defendant says was unduly prejudicial to his defense in the jury's eyes. However, Lee challenged the admissibility of the gun conviction on appeal, and the Sixth Circuit rejected that claim, finding no error in admission of the firearm conviction after Lee "opened the door" to impeachment by stating during his testimony, "I don't have guns around me." *See United States v. Lee*, 834 F. App'x 160, 165 (6th Cir. 2020). Lee cannot establish that he was prejudiced by failure to make additional efforts to litigate the admissibility of his gun conviction because his argument already has been foreclosed by the ruling on appeal. This argument, therefore, is rejected. Nonetheless, Lee's prior convictions may be relevant to the question whether Blake performed deficiently by failing to prepare his client adequately to testify.

6.  Mental Health, Substance Abuse, and Competency

Sixth, Lee argues that Blake was ineffective by failing to investigate his mental health and substance abuse issues during the pretrial proceedings, failing to move for a competency evaluation before trial, and allowing him to testify when he was under the influence of various substances and alcohol.  The substance of the claims that Lee was allowed to testify while under the influence is difficult to assess without Blake's testimony.  The government says that Blake would testify that Lee informed him that he possibly was under the influence of drugs or alcohol during the trial, but that his behavior "appeared normal."  In addition to whatever testimony Blake may supply, the Court also may rely on its own assessment of the petitioner's demeanor during the trial as an indication of his mental state.  *See Black v. Bell*, 664 F.3d 81, 102 (6th Cir. 2011) ("'[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient.'") (quoting *Carter v. Bogan*, 900 F.3d 754, 769 (6th Cir. 2018)).  On that point, the characterization of Lee's demeanor on the witness stand as "normal" does not correspond to the Court's recollection.

The principal evidence cited by the petitioner to support this claim is the report of an examiner who was appointed by the Court to conduct a post-trial competency assessment.  It is well-established that "[c]ounsel's failure to request the trial court to order a hearing or evaluation on the issue of the defendant's competency might render counsel's performance objectively unreasonable, provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency."  *United States v. Dubrule*, 822 F.3d 866, 881 (6th Cir. 2016) (quotations omitted).  Notably, the Court reviewed that report and previously

concluded that Lee was competent both during the sentencing phase *and at the time of trial*. *See* Hr'g Tr., ECF No. 90, PageID.1158-59. Lee says that the post-trial competency evaluation was conducted after he had been incarcerated and medicated for some time. But when undertaking the post-trial competency review, the Court took into consideration all the indicia of inebriation and mental instability to which the petitioner alludes in his present motion. Because the petitioner only has presented evidence about his mental state that previously was reviewed by the Court in determining his competency, he cannot prevail on the claim that he was prejudiced by Blake's failure to pursue additional competency proceedings before trial.

Legal competency, however, does not necessarily establish fitness to testify. "In assessing competence, the relevant question is whether the defendant's 'mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.'" *Hill v. Shoop*, 11 F.4th 373, 434 (6th Cir. 2021) (quoting *Indiana v. Edwards*, 554 U.S. 164, 170 (2008)). As mentioned, the Court is satisfied that Lee was competent to stand trial under that standard.

Whether he was fit to testify is a different issue. A defendant who is under the influence of drugs — whether prescribed medications or recreational substances — may not be able to present a cogent version of the events or be in a condition to withstand the rigors of cross-examination. The decision to call a witness in such a debilitated condition may constitute deficient performance. That fault may be compounded when the witness is the defendant. An evidentiary hearing is required to assess the quantum of counsel's knowledge and his decision-making when he chose to call Lee as a defense witness.

7.   Opening the Door to Impeachment

Seventh, Lee contends that Blake's insufficient preparation for his testimony resulted in him uttering the statement that "opened the door" to impeachment with his prior gun conviction. The government says that Blake is expected to testify that (1) Lee indicated consistently prior to and during the trial that he did not intend to testify (2) he changed his mind only after the close of proofs and insisted on testifying on the final day of trial, (3) during a trial recess, Blake spent approximately 54 minutes consulting with Lee about his decision to testify, and (4) during the consultation, Blake explained that there was insufficient time to review Lee's prospective testimony due to the last minute change of plans, and that his prior convictions could be used to impeach him.

The petitioner contests these assertions.  An evidentiary hearing is necessary to determine the facts.  Of course, prejudice cannot be found where the claimant "does not explain what testimony [a witness] would have presented had [he] been prepared more effectively or how that testimony would have differed materially from the evidence that the jury did consider." *Hill v. Mitchell*, 140 F. App'x 597, 598 (6th Cir. 2005).  But Lee has made a sufficient showing about the level of preparation to permit an inference of deficient performance and prejudice, depending on the proofs at the hearing.  If Blake testifies, as expected, that he did advise Lee about the consequences of testifying, which would include admission of his prior convictions, then it will be difficult for Lee to establish that he was insufficiently warned about the consequences of his anticipated testimony, particularly from such things as testimony claiming that he "don't have guns" around him.  The efficacy of that warning, though, must be evaluated along with the evidence, if any, of Lee's mental condition at the time and Blake's perception of it when he made the decision to call him as a witness.

### 8.  Interstate Commerce Stipulation

Eighth, Lee argues that Blake was ineffective when he agreed to stipulate that the gun in question traveled in interstate commerce without probing behind the substance of a cursory report by the government's expert opining on that point.  However, as the Sixth Circuit has explained, "factual stipulations to elements of a crime are often the product of a sound trial strategy.  For example, where a prior felony conviction is an element of the offense, a sound strategy may be to stipulate to the existence of the conviction rather than allow the jury to hear details about the earlier crime." *United States v. Monghan*, 409 F. App'x 872, 877 (6th Cir. 2011) (citing *Old Chief v. United States*, 519 U.S. 172, 185 (1997) ("[T]here can be no question that evidence of the name or nature of the prior offense generally carries a risk of unfair prejudice to the defendant.")).  The petitioner has not presented any factual basis to question that the weapon was manufactured outside of Michigan and must have crossed state lines to arrive on the streets of Detroit.  Where there is no genuine dispute about the place of origin of the weapon, the petitioner cannot show that he was prejudiced by failure to put the government to the proofs on this element of the crime.  *See id.* at 877-78.  Lee is not entitled to relief on this issue.

### 9.  Stipulation re: Prior Convictions

The same holds true for Lee's contention that Blake was ineffective by agreeing to stipulate that the defendant "had been convicted of a felony, a crime punishable by more than one year in prison, knew that he had been convicted of a felony and had not had his conviction or his rights restored," which he says "doomed his chances both at trial and on appeal."  Lee cannot prevail on this claim because it is undisputed that he was, in fact, convicted of a previous felony.  Moreover, there is ample undisputed evidence from which a jury reasonably could have concluded that he was aware of his prohibited status as a convicted felon.

The Sixth Circuit addressed and specifically rejected the defendant's underlying position on this claim when addressing the sufficiency of the evidence in his related claim on direct appeal. As the court of appeals noted, "Lee also had been previously convicted of being a felon in possession of a firearm, which is enough for a jury to infer that Lee knew of his prohibited status." *Lee*, 834 F. App'x at 168 (citing *United States v. Conley*, 802 F. App'x 919, 924 (6th Cir. 2020); *United States v. Benamor*, 937 F.3d 1182, 1189 (9th Cir. 2019)). Lee cannot establish that the decision to enter into the stipulation about his prohibited status was anything other than sound trial strategy calculated to avoid the need for any proofs about the defendant's prior convictions to be put before the jury. He is not entitled to relief on this issue.

### 10. ACCA Enhancement

Finally, Lee argues that his post-trial replacement counsel was ineffective by failing to challenge the ACCA sentencing enhancement on the ground that the state law under which he was convicted for controlled substance offenses "punishes a much broader range of conduct than that anticipated by the federal definition of what constitutes a serious drug offense." That argument is a non-starter, since the Sixth Circuit has held squarely that drug convictions under Michigan state law are valid ACCA predicates. *United States v. Thomas*, 969 F.3d 583, 585 (6th Cir. 2020) ("As we recently clarified . . . the definition of delivery used under Michigan (and federal) law — again, 'the actual, constructive, or attempted transfer of a controlled substance' — does not include 'attempted delivery.' *United States v. Garth*, 965 F.3d 493, 497 (6th Cir. 2020). Instead, it includes only 'attempted transfer.' And an attempted transfer qualifies as a completed delivery. *Id.* That makes the definition here different than the one in *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019), where the parties agreed that the statute in question — Tennessee's delivery statute —

proscribed attempted delivery. *Id.* at 385.").  Lee's counsel cannot be deemed ineffective for failing to raise a legally groundless objection to the sentence enhancement.

### III.  Motion for Bond

Lee also has file a motion for bond pending a decision on his motion under section 2255. The Bail Reform Act does not apply to motions for release pending resolution of a collateral attack of a conviction.  *United States v. Mett*, 41 F.3d 1281, 1282 (9th Cir. 1995).  However, the Court has the "inherent power" to grant a prisoner release on bond pending disposition of a section 2255 motion.  *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986) (quoting *In re Wainwright*, 518 F.2d 173, 174 (5th Cir. 1975) (per curiam) (quotation marks omitted)).  To receive bail pending a decision on such motions, "prisoners must be able to show not only a substantial claim of law based on the facts surrounding the petition but also the existence of 'some circumstance making [the motion for bail] exceptional and deserving of special treatment in the interests of justice.'" *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990) (quoting *Aronson v. May*, 85 S. Ct. 3, 5, (1964) (Douglas, J., in chambers)).  "There will be few occasions where a prisoner will meet this standard."  *Ibid.*  Lee has not made the requisite showing here, and he not entitled to bail at this stage of the case.

### IV.  Conclusion

Except for some of the petitioner's claims of ineffective assistance of trial counsel, the arguments presented in this motion to vacate the sentence have been forfeited and do not warrant relief.  The claims of ineffective assistance of counsel based on the adequacy of trial counsel's challenge to the basis of the investigatory stop, trial counsel's alleged failure to review the body camera footage before the hearing on the motion to suppress and to point out portions of the video that contradicted Officer Brents's testimony about dropping a coffee cup, failing to file any pretrial

motions *in limine* and failing adequately to present any contemporaneous objection to the admissibility of his prior convictions at trial, failing to obtain a pretrial competency examination, agreeing to stipulate to the interstate commerce nexus of the firearm and the fact of the petitioner's prior felony conviction, and post-trial counsel's failure to challenge the Armed Career Criminal Act sentencing enhancement do not warrant relief because the petitioner has not established deficient performance or prejudice.  The rest of the petitioner's arguments that trial counsel was constitutionally ineffective require an evidentiary hearing.  The petitioner does not qualify for release on bond pending the resolution of his motion.

Accordingly, it is **ORDERED** that the petitioner's motion to vacate his sentence (ECF No. 103) is **DENIED IN PART**.

It is further **ORDERED** that the petitioner's motion for bond pending disposition of the present motion (ECF No. 193) is **DENIED**.

It is further **ORDERED** that the parties shall appear for an evidentiary hearing before the Court on **May 23, 2024 at 2:00 p.m.**  On or before **May 9, 2024**, the parties must file with the Court a list of the witnesses they intend to call with an estimate of the time for their direct examination, together with a list of the exhibits they intend to present.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  April 8, 2024