UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENVER LEE,

                Petitioner,

v.

UNITED STATES OF AMERICA,

                Respondent.

Case Number 18-20198
Civil Case Number 21-10326
Honorable David M. Lawson

_____/

**<u>OPINION AND ORDER GRANTING MOTION TO VACATE SENTENCE</u>**

Defendant Denver Lee was convicted by a jury of possessing a firearm as a convicted felon and sentenced to 15 years in prison under the Armed Career Criminal Act (ACCA). He moves to vacate his sentence. In a previous opinion, the Court found that several of Lee's arguments were forfeited, and that some of the bases for his assertion that his trial and appellate counsel were constitutionally ineffective were meritless. *See* ECF No. 207. However, other grounds for his ineffective-assistance-of-counsel claims required an evidentiary hearing to resolve. The Court held an evidentiary hearing on August 7, 2024. The parties asked to file post-hearing briefs, and the filing deadline was extended at their request. The evidence in this case, including the testimony and evidence presented at the evidentiary hearing, establishes that Lee did not receive the effective assistance of trial counsel that the Sixth Amendment guarantees. Therefore, the Court will grant his motion, vacate his conviction and sentence, restore the case to the active trial docket, and reinstate the bond that was granted before trial.

I.

For convenience, the Court will repeat some of the case history that was discussed in the earlier opinion denying in part the motion to vacate the sentence.

A. Trial Evidence

On the evening of February 15, 2018, around 9:00 p.m., four officers of the City of Detroit police department were on patrol in a neighborhood near Sunderland Road and Seven Mile Road in Detroit.  The officers attested that they knew this to be a "high crime area" of the city.  They saw two cars parked next to each other in the middle of Sunderland, one facing north and one facing south, and they approached the cars to inform the drivers that they were blocking traffic.

As they approached, the officers saw a driver seated in each car and two men, one of whom was defendant Denver Lee, standing in the street between the cars.  The officers observed that the gathering of men and cars was preventing other vehicles from passing.  As the police approached the group, Officer Darrell Brents turned his patrol car's searchlight on them.  Brents's version of the events is that he observed Lee look toward the police cruisers with a "wide-eyed nervous expression," then clutched at the front center pocket of the sweatshirt that he was wearing and quickly walked north, away from the police cruiser, looking back at the officers as he walked.  Brents testified that Lee's walk appeared suspicious, as if he were hiding something, and Brents believed that Lee might be about to run from the officers.  Brents stepped out of his patrol car along with the other officers and began to follow Lee, while the other officers approached the persons who were still near the parked cars.

As Brents approached Lee near the front of one of the cars, Lee turned toward him.  The scout car's light was still illuminating Lee.  Brents saw Lee still clutching the pocket of his hooded sweatshirt, still with the same wide-eyed and nervous expression.  At that point, Brents was around five or six feet from Lee, and as he observed Lee's pocket, he saw a heavily weighted bulge in the pocket where Lee was grabbing.  Brents believed the bulge to be a firearm, and he frisked Lee, feeling the outside of the sweatshirt pocket.  He immediately felt an object that he recognized as a gun; he then reached into the pocket and recovered a Smith & Wesson Bodyguard .380 caliber

handgun, loaded with six live rounds.  Brents testified at trial that he located and retrieved the

subject weapon directly from Lee's sweatshirt pocket:

> Q. And when you did that pat down, did you feel the area of that weighted bulge you had seen before?
>
> A. Yes, sir.
>
> Q. And could you identify what that item was?
>
> A. Immediately identified it to be a handgun.
>
> Q. How did you know that?
>
> A. Just experience.
>
> Q. Have you frisked people before in patrol?
>
> A. Yes, sir.
>
> Q. How many times?
>
> A. Numerous. I can't give an accurate answer on that.
>
> Q. And have you felt firearms through a pocket like that before?
>
> A. Yes, sir.
>
> Q. When you recognized the item was a firearm, what did you do next?
>
> A. Well, I immediately notified my partners that Mr. Lee was armed and I reached into the pocket and retrieved the weapon.

Trial Tr., Vol. II, ECF No. 41, PageID.421.

Lieutenant Willie Duncan corroborated Brents's testimony and stated that, while standing

beside Lee and holding Lee's arm, he observed Brents recover the weapon from Lee's sweatshirt

pocket:

> A. I grabbed Mr. Lee by his right arm. I was holding his arm. I observed Officer Brents grab a handgun from his front pocket, hoody pocket. I placed him in handcuffs.  And once Mr. Lee was secured and handcuffed, I immediately went back to talk to the driver of the vehicle.

Q. And I want to take that step-by-step just a little bit. So when you first arrived, had Officer Brents already recovered a gun from Mr. Lee?

A. No. He was recovering it. He recovered it once I was already there.

Q. Okay. And did you see him actually reach into Mr. Lee's pocket and recover that gun?

A. I saw him coming out of his pocket with a handgun, yes.

Q. Okay. Do you remember which hand he was using when he recovered it?

A. His left hand.

Q. What kind of gun was it that he recovered?

A. It was a blue steel automatic.

Trial Tr., Vol. II, ECF No. 41, PageID.506.

Finally, Officer Shaun Dunning also testified that he observed Brents recover the gun from Lee's pocket. When asked what Dunning did as he approached the parked vehicles at the scene, Dunning stated:

A. I immediately went to Mr. Denver Lee. He had a coffee cup in his hand. I removed the coffee cup and put it to the ground. And at that point I assisted Lieutenant Duncan with arresting the defendant.

Q. Did you see anything as you were walking towards the defendant?

A. I did. I observed Officer Brents motioning towards his left side as if he was pulling out and away a firearm, away from Mr. Denver Lee.

Q. Did you ever see a firearm that evening?

A. I did. I saw a black small caliber firearm, later to be known as a black Smith & Wesson .380 caliber.

Trial Tr., Vol. II, ECF No. 41, PageID.529-30.

The government introduced in evidence video recordings from the officer's body and dash cameras. The videos were unclear in many aspects, but defense counsel did not examine them in detail. More information on the contents of those videos was brought out in detailed testimony

- 4 -

taken at the post-trial evidentiary hearing.  Several of the most crucial details disclosed by the video footage never were highlighted for either the Court or the jury in any of the pretrial proceedings or at trial.  Those aspects are discussed further below.

Lee testified on his own behalf at trial, denying that he at any time possessed a firearm.  He acknowledged that he was present on Sunderland Steet that evening, explaining that he was meeting an employee, Lena Safadi, who was to give him some cash.  Lee said that when he arrived, both cars were in the street. One of them was driven by Safadi.  She was in her car when she handed him the cash.  It is undisputed that the handgun that the police maintain was seized from Lee was registered to Safadi.  Lee said that he did not see a handgun in her car, and he never took possession of a gun from her.  Instead, he said that the police arrived suddenly, shined a light on him, and immediately put him in handcuffs.

### B. Trial Counsel's Conduct

In a supplement presented by his appointed counsel, Lee discusses several aspects of his trial representation that allegedly were deficient, and he describes circumstances that allegedly explain the poor performance by his trial counsel, Wright Blake.

First, Lee says that at a motion to suppress hearing Blake should have impeached the police officers who testified by asserting that the sweatshirt the defendant was wearing was black in color, not blue.  However, despite obtaining two continuances of the hearing to different dates, Blake was unprepared and failed to bring the sweatshirt to present as evidence.

Second, Lee says that body camera footage from the scene showed that Lee never dropped a coffee cup which he was holding in his hand.  Officer Brents testified at the suppression motion hearing that Lee was startled and dropped the cup, which was part of the information Brents relied on to formulate his reasonable suspicion to support the pat down.  Lee says the footage shows that

the cup was knocked out of Lee's hand by another officer, but Blake was not able to use that footage for impeachment because he had not watched the video before the suppression hearing.

Third, Lee says that, on August 5, 2018, Blake was arrested for third-offense operating while under the influence, and that his arrest and detention on that felony charge likely explain why he failed to appear for a scheduled hearing date on August 6, 2018. Blake eventually pleaded no-contest to a reduced misdemeanor charge and consented to a reprimand by the State Bar of Michigan in February 2022. Lee was unaware of Blake's substance abuse issue or the pending charges during his trial.

Fourth, Lee's appointed counsel retained an investigator who located and interviewed a witness, Bennie Blakely, who is a prisoner presently in the custody of the Michigan Department of Corrections. Blakely told Lee's investigator that he was the driver of the other car at the scene in February 2018. The investigator attested that Blakely further stated that the police did not take a gun from Lee's person during the arrest. Desiree Edwards aff., ECF No. 189-2, PageID.2397. Blakely indicated that he would have testified at trial, but he never was contacted by attorney Blake.

Fifth, Lee's counsel also located and interviewed Crystal Brown, who stated that she has known the defendant for 10 years and was willing to testify about Lee's character. Ms. Brown evidently was willing to testify at trial and may have appeared in Court on October 17, 2018, but Blake decided not to call her.

Sixth, Lee says that after the government rested, Blake initially indicated to the Court that Lee would not testify, but less than one hour after that indication Lee took the stand in his defense. Lee says that Blake did nothing to prepare him to testify before he took the stand, either by preparing other witnesses to support his testimony, or by discussing Lee's own testimony in

advance. Lee says Blake knew that he never had testified at trial before, because Blake represented

him in earlier proceedings that all were resolved by guilty pleas.

Finally, Lee says that during an April 6, 2021 telephone interview with the government

attorneys on the case, John Meixner and Hank Moon, Blake admitted all of the following

circumstances: (1) on October 17, 2018, Lee told Blake that he was "high," (2) Blake knew that

Lee smoked marijuana on a "daily" basis, (3) Blake told Lee not to testify, (4) Blake did not prepare

Lee to testify, and (5) the entire discussion about whether Lee would testify only took around 15

minutes prior to Lee taking the stand.

## C. Defendant's Mental Condition

Lee says that he told Blake that he had mental health and substance abuse issues throughout

the trial proceedings. He points to Wayne County Jail records disclosing that, on October 18,

2018, when he was taken back to the jail, he reported that he had used marijuana and promethazine

with codeine. He also stated to jail personnel that he was hallucinating during the trial, that he saw

persons in the courtroom speaking to him who were not there, and that throughout the trial he "saw

'purple dragons about the size of babies' flying around the courtroom, at times chewing on the

trial judge's head." *See* Report of Dr. Jeffrey Wendt dated July 16, 2019 (previously accepted by

the Court at the post-trial competency hearing). Lee says that although he was found to be

competent during a post-trial competency hearing, that determination was made after he had been

incarcerated and medicated for some time following the trial.

## D. Proceedings

The indictment in this case, which charged Lee with possessing a firearm after having been

convicted of a felony, contrary to 18 U.S.C. § 922(g)(1), included a charging enhancement under

18 U.S.C. § 924(e) for the defendant's alleged status as an armed career criminal. The defendant

filed a motion to suppress evidence of the gun retrieved during the pat down encounter, arguing

that (1) the officers had no warrant and no probable cause to arrest the defendant for violating any criminal statute or ordinance based on the observation that his vehicle was "impeding traffic," and (2) the circumstances of the encounter did not supply any reasonable suspicion for the stop and frisk. The Court denied the motion. The case was tried to a jury, which returned a guilty verdict on October 19, 2018.

On November 19, 2018, the defendant, through his trial counsel, filed a motion for judgment of acquittal on the ground that the trial evidence was insufficient to sustain a conviction. The Court denied that motion in an opinion issued on January 17, 2019. ECF No. 56; *United States v. Lee*, No. 18-20198, 2019 WL 244789, at *1-3 (E.D. Mich. Jan. 17, 2019), *aff'd*, 834 F. App'x 160, 2020 WL 6441164 (6th Cir. 2020). On December 10, 2018, the defendant retained new counsel who appeared on his behalf and sought more time to file a motion for a competency hearing and a second motion for a new trial. Defendant's trial counsel, Wright Blake, was permitted to withdraw on February 21, 2019.

On April 25, 2019, the defendant's new lawyer filed a motion for a competency hearing, and on August 6, 2019, with leave granted, he filed a second motion for a new trial under Federal Rule of Criminal Procedure 33, arguing that the defendant's trial counsel was ineffective. On September 3, 2019, the Court held a competency hearing and heard oral argument on the defendant's second motion for new trial. At the conclusion of the hearing the Court issued rulings from the bench finding that the defendant was competent then and at the time of trial. The Court also held that the ineffective assistance issue was not properly presented in a new trial motion but should instead be raised on collateral review. ECF No. 85 (Sept. 3, 2019); *see also United States v. Lee*, 834 F. App'x 160, 163 (6th Cir. 2020) ("[U]pon finding that the record was not fully developed and that under Sixth Circuit precedent 'the question of ineffective assistance of counsel

ought to be raised on collateral review,' the court denied the motion (though the court noted that Lee could later raise the issue in a 28 U.S.C. § 2255 motion).").

On September 9, 2019, the Court sentenced Lee to a below guidelines, mandatory minimum term of 180 months in prison.

Lee appealed his conviction and sentence and presented several claims of error. The Sixth Circuit rejected all of those arguments and affirmed the conviction and sentence. 834 F. App'x 160.

On January 29, 2021, Lee filed a *pro se* motion to vacate his conviction and sentence under 28 U.S.C. § 2255, arguing that his trial and appellate lawyers were ineffective in several ways, and also reasserting other claims of error. The Court appointed counsel, who engaged in fact development and filed a supplemental brief focusing on the ineffective assistance claims.

### E. Evidentiary Hearing

Wright Blake, Lee's trial attorney, testified at the evidentiary hearing that he had practiced law in Michigan for 39 years since receiving a law degree from the University of Missouri in 1983. He handled hundreds of cases in state and federal court and 90 to 95% of those were criminal cases. He had known defendant Lee since around 2016 and had represented him in several other state court cases from 2016 through 2018. All those cases were resolved by guilty pleas and Lee had received probation.

Blake explained that the charges in the present case were filed initially in state court. Lee retained Blake for those proceedings, and the representation continued when the prosecution was taken up by federal authorities. He acknowledged receiving a discovery packet from the government that included at least two body camera videos. He had some difficulty getting access

to the videos due to the file encryption that was used, but he said that eventually the videos were accessed.

Blake said he had reviewed all of the documentary and video discovery upon first receiving the discovery materials from the state prosecutor. The government presented a March 30, 2018 letter that Blake received from the government concerning discovery disclosures (Exhibit 201). The discovery listed included a digital disc, five video files, and other items. Blake said that he reviewed all of the materials with Lee during several client meetings after the case went to federal court, although his unfamiliarity with some of the video evidence at pretrial hearings calls that testimony into question. Evid. Hr'g Tr., ECF No. 226, PageID.2601-02. Nonetheless, Blake said that after the motion hearing he retained a video analyst to assist him in reviewing the video and preparing to use the footage to attack the officers' credibility, but he did not intend to call the analyst as a witness at trial. *Id.* at PageID.2676.

The suppression hearing was set for August 2, 2018. Blake said he probably watched the body cam videos before the hearing, Lee also had a copy, and he may have reviewed the videos with his client. Hr'g Tr. at 2601-02. Lee disputed these assertions. *Id.* at 2689. Officer Brents had written in his report and testified that Lee was wearing a blue sweater, and Blake contested that fact at the hearing asserting that the defendant's sweater was not blue but black. *Id.* at 2611. Brents also testified that Lee had dropped a coffee cup he was holding because he was startled by the officers' approach or attempting to evade their scrutiny. After reviewing the evidentiary hearing transcript, Blake admitted that he never cross-examined Brents about the fact that the body cam video showed that Lee still had the cup in his hand when he was standing in front of a vehicle during the initial conversation with the officers, and that one of the officers walked over and slapped the cup out of his hand. Blake admitted that the fact that Lee allegedly dropped the cup

and that the startled response purportedly contributed to Brents's assessment of probable cause made the supposed dropping of the cup a significant fact. He said that he decided not to question Brents about the contradiction because he did not think it to be "strategically poignant." *Id.* at 2504-05.

Blake said that he raised the issue of the black sweatshirt because Lee insisted that he was wearing a black sweatshirt. Blake testified that he did watch the video, but he thought that it was reasonable to contest the color of the garment despite the video evidence. Hr'g Tr. at 2607-08. In fact, he requested a continuation of the hearing to allow him to bring in the sweatshirt and offer it as impeachment evidence. Blake said that after Lee brought the sweatshirt to his office, he observed that it was not consistent with the defendant's prior description, so he decided that there was no strategic value in pursuing the issue. *Id.* at 2608-09.

Evidence that could be extracted from the body camera videos could have played an important part of the suppression hearing and trial, which Blake acknowledged. He testified that he reviewed the videos further with his client and undertook to have the videos slowed down by a video specialist. He explored having the videos enhanced but was told that the process would distort the videos. Hr'g Tr. at 2613. Blake said that the slowed-down videos were presented during trial, but he conceded that at the suppression hearing he did not have a video specialist available to present the videos, and he relied on the Court to review them on its own. *Id.* at 2614.

At trial the government offered a segment of video that was admitted as trial Exhibit 6A, which was identified as defendant's hearing Exhibit 1. When looking at the video at the hearing, Blake admitted that in the video clip it appeared that another officer who was approaching Brents had something in his hand. And when looking at still images from the videos (hearing Exhibits 3

and 4), Blake conceded that the object in the approaching officer's hand could be a gun.  Hr'g Tr. at 2618-19.

Blake said that he had seen the video before trial, but he did not cross-examine any of the officers about the object seen in the video.  He could not explain why.  Blake admitted that he could have pointed to the image of the object during cross-examination to impeach Officer Brendts's testimony that he retrieved a gun from Lee's person (reasonably suggesting that Brents obtained a weapon from another officer and falsely reported that it was taken from Lee), but he did not do that and could not explain why.  Hr'g Tr. at 2620-21.

At the hearing, Lee's attorney showed Blake a segment of body camera footage, hearing Exhibit 7A, which had been admitted as an exhibit at trial.  Blake observed that there were two men standing in the street, but he could not recall the names of the person shown in the middle of the frame; Blake identified the other person in the video as Mr. Brown.  Blake said that he did locate and interview Brown before the trial.  Upon further questioning, Blake recalled that the unidentified person was "Gillespie."  Hr'g Tr. at 2625-27.  However, after the trial Blake learned that Gillespie had given police a different name from his own, and his actual name was "Bennie Blakely."  Gillespie was known to Blake to be the driver of one of the vehicles at the scene (a blue Honda).  *Id.* at 2627.  Blake admitted that he did not locate or interview Mr. Gillespie before trial, because he did not think Gillespie's testimony would have been helpful.  But Blake conceded that from the video it appeared that Gillespie had a "front row" perspective on the situation and might have testified about whether a gun was seized from Mr. Lee's person.  Blake could not recall what he did to attempt to locate Gillespie, and he conceded that he did nothing to attempt to make contact.  He admitted that in the past he had employed investigators to locate witnesses.  *Id.* at 2631-33.

- 12 -

Blake testified that he talked to Lena Safadi, who also was at the scene, and he acknowledged that Dunning's body camera video showed her admitting that the gun that was seized was hers. Hr'g Tr. at 2635-36. Blake conceded that he did not use the video at trial, and he did not call Safadi as a trial witness, despite representing to the Court that he might call her. Blake said he did not recall whether Lee insisted that Safadi should testify. *Id.* at 2636-37. Exhibit 7D, further footage from Officer Dunning's body camera, depicted Safadi discussing with officers that she has a concealed pistol license (CPL) and that the gun in her car was possessed legally by her. Blake admitted that nothing in the interaction with Safadi implicated Lee, and he admitted that he never offered any of the videos or called Safadi at trial to testify about her ownership of any gun. *Id.* at 2640-41.

Blake viewed hearing Exhibit 7E, footage from Officer Brents's body camera, and he conceded that it shows Lee in handcuffs and that officers were conducting a pat down search. Blake admitted that the video clip did not show any gun being retrieved and Brents does not mention a gun during the footage. Blake conceded that he did not cross-examine Brents based on anything shown in Exhibit 7E. Hr'g Tr. at 2641-43.

Lee's attorney explored with Blake the subject of Lee testifying at trial. Blake said that Lee may have asked about testifying, but he never said explicitly that he did want to testify, and Blake did not engage in any preparation for Lee to testify before the second day of the trial when Lee was to take the stand. Hr'g Tr. at 2643. Blake conceded that preparing a defendant to testify would have been one of the most important aspects of criminal trial preparation and would require significant time. He admitted that trial preparation would have included discussing with his client how to avoid opening the door to admission of prior convictions into evidence. *Id.* at 2643-45.

Blake testified that the first time Lee actually told him he wanted to testify was after the government rested. Blake had not worked with Lee to prepare his testimony. Blake recalled that the Court had ruled that certain prior convictions by Lee would be admissible, but it had ruled that evidence of a 2005 felon-in-possession conviction would be excluded due to unfair prejudice. Blake had advised Lee that his other convictions would be admissible, but Lee still wanted to testify. Hr'g Tr. at 2646-48.

There was a 45-minute break in the trial, during which Lee told Blake that he was "high." Blake knew that Lee used marijuana and a drug cocktail known on the street as "lean" on a daily basis. He said that he met with Lee at least 20 times during the trial phase of this case and he was aware that Lee frequently smoked marijuana, but he did not observe Lee to be impaired or unable effectively to discuss the case and understand legal advice on those occasions. Hr'g Tr. at 2645-46.

Still, Blake admitted that a 45-minute break was not sufficient to allow adequate preparation for Lee to take the stand. Blake said he discussed with Lee the "pitfalls" of testifying and his right not to testify, and that he was "concerned" about Lee's understanding of his legal advice because he was high at the time. He also was apprehensive over calling Lee as a witness because Lee was high, his ability to recall events likely was compromised, and he was unsure if Lee would follow legal advice and maintain his composure while on the witness stand. At the hearing, Blake testified that he could not recall whether Lee said he was "hallucinating," but Lee might have told Blake that he was seeing a person sitting in the jury box who was not actually present. Hr'g Tr. at 2648-50.

Despite these concerns, Blake admitted that he did not request a trial adjournment to allow proper preparation for Lee to testify and to allow the influence of Lee's drugs to abate, even though

- 14 -

he could have argued that an adjournment was necessary due to the shift in trial strategy.  And Blake admitted that it was not sound trial strategy not to request an adjournment.  *Id.* at 2651-52.

As a consequence, Lee's testimony "went sideways," Blake acknowledged, including when he swore repeatedly, broke down crying, and talked over questioners.  Worse, Lee's testimony opened the door to admission of a 2005 conviction for being a felon in possession of a gun, which, Blake acknowledged, was extremely prejudicial to the defense.  Blake agreed that it was possible that with proper preparation, Lee could have avoided opening the door to admission of the 2005 conviction.  And Blake admitted that if he had the case today, he would have sought an adjournment to allow for proper preparation for Lee's testimony.  Hr'g Tr. at 2652-54.

Blake also was questioned about the personal difficulties that confronted him while Lee's case was pending.  He admitted that the continued suppression hearing scheduled for August 6, 2018 did not occur because on August 5, 2018 he was arrested for felony drunk driving.  The drunk driving charges were pending during the criminal prosecution in this case and Blake was under court supervision.  Blake ultimately pleaded guilty to a misdemeanor charge and also accepted a reprimand from the state bar.  He never told Lee about these events, but Blake insisted that the pendency of the charges and court supervision did not impact his ability to investigate and prepare for trial in Lee's case.  Hr'g Tr. at 2658-59.

At the hearing, the defendant offered an affidavit from a defense investigator who interviewed Bennie Blakely in prison.  Blakely said that he met Lee on Sutherland Street on the night of the arrest.  He drove to the location; Damian Brown was a passenger in his car.  From his car, he watched Lee walk across the street when the police arrived.  He said it appeared that Brown knew the officers and was assuring them that they should leave Lee alone.  Blakely said that the police did not pat down Lee, and it was possible that they planted a gun on him.  ("Denver was in

- 15 -

plain sight. He was on the hood of my car. They didn't pat him down and they didn't take no gun off him."). ECF No. 189-2, PageID.2397.

Defendant Lee also testified at the hearing. He confirmed that this prosecution started in state court, but he said there was no preliminary examination. Hr'g Tr. at 2697. (Wright Blake said that there had been preliminary examination testimony from the officers.) He said that he never reviewed any body camera footage from the scene, and Blake told him that the videos could not be viewed because access codes for the digital files had not been received. Lee said that he did not think that Blake previously had viewed the videos since they had not viewed them together before the suppression hearing. *Id.* at 2698-99.

Lee said that on August 6, 2018, the date of the continued suppression hearing, he waited for Blake at his office in the morning but Blake did not appear. Eventually Lee spoke to Blake, who told him that he had had a "car accident" and the suppression hearing was adjourned for 30 days. Lee testified that if he had known on August 6 that Blake was charged with drunk driving, he would have relied on a different lawyer that he had on retainer.

Lee said that on August 2, 2018, after the first suppression hearing, he went to Blake's office and both of them reviewed portions of the video since Blake then had the access codes. Hr'g Tr. at 2699. Lee said that he never saw the full body camera recordings before trial, and portions of the video of Lena Safadi that he did review were "zoomed in" so that the surroundings and persons present were not visible. *Id.* at 2701-02. Lee told Blake that he wanted Lena Safadi to testify at trial and that it always was his intent to have her called as a witness. *Id.* at 2703-04.

Lee also said that before the trial he told Blake that he might want to testify at trial if Safadi did not testify. Lee said that Blake never did any trial preparation for his testimony, and Blake

told him he would not need to testify because the government would not be able to prove its case. Hr'g Tr. at 2704-05.

Lee testified that before trial he had been prescribed codeine, but he used more than the daily prescribed dose on the trial days. He said that during the trial, he was hallucinating, and on the day that he testified he had hallucinations; he asked Blake how many black people were on the jury and if a person he knew to be deceased was seated in the jury box. Blake told Lee that he "was tripping." Hr'g Tr. at 2606-07. Lee knew that he was hallucinating on the day he testified, and he did not remember what was discussed during the trial breaks when he decided to testify. He was not in a "sober frame of mind" when he decided to testify, and he believed that his condition impaired his conduct on the stand. *Id.* at 2710. As to his answers that led to the admissibility of his prior firearm conviction, Lee said that he did not understand when he was questioned by Blake that his answer "I don't have guns around me" was opening the door to admissibility of his prior conviction from 2005 because he did not think his answer related to his "entire life." *Id.* at 2710-11.

Lee admitted on cross-examination at the hearing that he told examining psychiatrist Dr. Wendt that he was concerned about calling Safadi as a trial witness because he thought that she might testify that the gun that was seized belonged to Lee, not Safadi, based on Lee's apprehension that Safadi was jealous of Lee's other girlfriends. The government presented Exhibit 204, a report prepared by Dr. Wendt in January 2019, and Lee admitted that he made statements to Dr. Wendt that he was concerned that Safadi was "setting him up" and that Safadi was "jealous." Hr'g Tr. at 2724-25.

At the hearing, Lee revealed that he had been consulting with another lawyer while his case was pending. He maintained that attorney Blake never gave him a copy of the body camera videos

with "the correct codes" to access the recordings.  But Lee gave the disc to attorney Mark Kriger, who he also had retained to represent him.  Lee believed that Kriger "got the correct codes" to access the disc "sometime during the summer of 2018."  But Lee never paid Kriger a full retainer, although he met with him on a couple occasions before the suppression hearing.  Hr'g Tr. at 2732-34.  The relationship ended before trial, and Lee could not remember whether Kriger ever gave the disc back to him.  *Id.* at 2740-42.

Lee's attorney called attorney Jerome Sabbota as a witness at the hearing to give his opinion on whether Wright Blake's performance was consistent with good practice.  Sabbota has been practicing criminal law since 1976, first as a prosecutor and then as a defense lawyer.  He was critical of Blake's representation in several respects, particularly dealing with Lee's trial testimony.  Sabbota believed that Blake's trial preparation and investigation was deficient, and his attempts to prepare Lee to testify were woefully inadequate.  He could not fathom why Blake did not seek an immediate trial adjournment when he was confronted with a client who insisted that he wanted to testify but who also exhibited debilitating effects of drugs and hallucinations.  In his opinion, Blake's representation fell below professional norms.

## F.  Remaining Ineffective Assistance of Counsel Arguments

Several of Lee's allegations of deficient performance were addressed in the previous opinion partially denying the section 2255 motion.  The remaining arguments required an evidentiary hearing.  Lee presses the claim that Blake was ineffective by failing to bring to the suppression hearing a "black sweatshirt" that Lee allegedly provided to him, telling Blake that it was the sweatshirt he was wearing when he was arrested, and by failing to review the body camera video and otherwise prepare properly for the suppression hearing.  That lack of preparation, Lee says, led to Blake's failure to point out portions of the video that showed, contrary to Officer

Brents's testimony, that Lee never "dropped" the coffee cup that he was holding, which Brents attributed to a desire to flee, purportedly adding to the basis of his suspicion.

Lee also contends that Blake was ineffective by failing to locate and interview Bennie Blakely, who, Lee says, would have testified at trial that he was present during the entire incident and saw that police never removed a gun from Lee's person during the arrest.

A more serious contention is Blake's dealings with Lee's decision to testify at trial. Lee says that Blake did not have a full appreciation of Lee's mental health and substance abuse issues during the pretrial proceedings, he failed to move for a competency evaluation before trial, and he allowed him to testify when he was under the influence of various substances and alcohol. The decision to call Lee as a witness, the woefully inadequate preparation leading to that decision, and the failure to move for an adjournment of the trial proceedings given Lee's condition are key points in Lee's defective performance catalog.

## II.

It is well accepted that a federal defendant challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). And he "must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)). The constitutional error claimed here is the deprivation of the effective assistance of counsel, which the Sixth Amendment guarantees. A claim of ineffective assistance of counsel is properly raised in a section 2255 motion. *United States*

*v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).  An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 511 (2003) (quoting *Strickland*, 466 U.S. at 688) (quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

When evaluating Lee's claims of deficient performance, three features stand out.  The first is attorney Blake's failure to call Bennie Blakely as a witness at trial.  It is true that Blake had understood this witness to be named "Gillespie" at the time before trial.  But Blake admitted that he did not locate or interview Mr. Gillespie before trial, because he did not think Gillespie's testimony would have been helpful.

The Sixth Circuit consistently has held that trial counsel performs deficiently when he or she either presents or chooses not to present witness testimony based on inadequate investigation and preparation. *English v. Romanowski*, 602 F.3d 714, 728-29 (6th Cir. 2010); *Combs v. Coyle*,

205 F.3d 269, 288 (6th Cir. 2000). The Supreme Court has found deficient performance under similar circumstances. *Wiggins*, 539 U.S. at 534; *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000). Blake never put forth a satisfactory answer for his failure to interview Gillespie — that is, Blakely — before trial. His assessment about the potential helpfulness of Blakely's testimony did not spring from any investigation, and therefore was uninformed. Counsel could not have developed a reasonable trial strategy since he based his decisionmaking on "what counsel guess[ed the witnesses] might say in the absence of a full investigation," and not "on what investigation reveals witnesses will actually testify to." *Ramonez v. Berghuis,* 490 F.3d 482, 489 (6th Cir. 2007).

Lee's current counsel actually did locate and interview Blakely. Had trial counsel done so, he would have learned that Blakely would have testified that he viewed defendant Lee "in plain sight" at the scene of the arrest, and that the police "didn't pat him down and they didn't take no gun off him." ECF No. 189-2, PageID.2397. That testimony, coupled with the image from Officer Brents's body camera that suggested that another officer was handing Brents a gun, severely undermines the Court's confidence in the jury's verdict and satisfies the prejudice component of *Strickland*'s test.

That leads to the second area of deficient performance. Based on the hearing evidence, it is reasonable to conclude that Blake's trial preparation did not include a thorough review of the body camera footage. That lack of preparation impacted Blake's performance at both the suppression hearing and the trial. Blake admitted that the video record from body worn cameras clearly contradicted testimony by Officer Darryl Brents that the defendant dropped a coffee cup when he was approached, which Brents interpreted as a sign of nervousness. Blake admitted that the video clearly showed the defendant holding the coffee cup until it was knocked out of his hand by another officer on the scene. And Blake conceded that he never cross-examined Brents about

the blatant discrepancy.  He acknowledged that the discrepancy was significant and impacted the credibility of Brents's core testimony about the basis of reasonable suspicion for stopping and frisking the petitioner.

Blake's admission that he did not attempt to impeach Brents about the discrepancy casts grave doubt on his assertion that he thoroughly reviewed the video before the evidentiary hearing. Furthermore, Blake admitted that the video showed the defendant wearing a blue sweater, but Blake attempted to argue during the evidentiary hearing that Lee was wearing a black sweater, purportedly based on Lee's assertion to that effect.  Blake's persistence in attempting to advance a factual assertion plainly contradicted by the video record further impairs the credibility of his insistence that he thoroughly reviewed the evidence before the hearing.

Even more critical, Blake was presented with a clip from the government's trial exhibit 6A, which is a segment of Brents's body camera recording.  The video clip was played for Blake and the Court and reviewed several times at slow speed.  The recording clearly depicts Lee standing in front of Officer Brents and beside a police car, while another officer at the scene approaches the two and swings his arm in a wide arc over the hood of the car.  The video shows the approaching officer holding an object in his hand, which Blake admitted "could be a gun."  Blake admitted that he never attempted to cross-examine Officer Brents or any other witness about the suspicious object or how it came to be in the approaching officer's hand.  That portion of the video record is powerful evidence that tends to cast grave doubt on Officer Brents's testimony that he retrieved a gun from the Lee's person.  That evidence also lends powerful support to Lee's factual defense that he never possessed a gun, and that the officers at the scene planted a gun on his person.  Blake admitted that if he had noticed the object in the video, he would have argued that it tended to support Mr. Lee's defense and to impeach Brents's testimony.  But that never occurred either

during the evidentiary hearing or, more critically, at trial.  Again, the failure to highlight such crucial and undeniable video evidence calls into doubt Blake's assertion that he thoroughly familiarized himself with the video record.  Examining that video footage is an exercise easily performed, as evidenced by Lee's current counsel.  Blake's failure to engage in that same task before trial — when it mattered most — falls below prevailing professional norms.

Perhaps the most serious professional lapse is the manner in which Blake handled his client's trial testimony.  Here, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland* at 688.  It was not.  Blake testified at the hearing that he harbored grave concerns about calling Lee as a witness — concerns that clearly sprung from Lee's physical and mental condition at the time.  But "having arrived at the decision to put [the defendant] on the witness stand, his defense attorneys were obligated to prepare him for his testimony." *Rayborn v. United States*, 489 F. App'x 871, 881 (6th Cir. 2012) (citing *Silva v. Woodford,* 279 F.3d 825, 833 (9th Cir. 2002)).

At the hearing, Blake candidly admitted that he did not have adequate time to prepare Lee to testify when Lee made an unanticipated decision to take the stand, following the close of the government's proofs.  Moreover, Blake was concerned that Lee was under the influence of marijuana and "lean."  Blake admitted that he had serious concerns about Lee's capacity to testify clearly and maintain his composure due to his substance abuse, and because Lee had told Blake during the trial that he was hallucinating, including seeing persons in the jury box who were not present.  Blake admitted that he could have sought an adjournment to allow adequate time to prepare Lee to testify and to allow Lee to sober up, but he did not.  The failure to make that request is a lapse that remains unexplained and is another feature of deficient performance.

Blake conceded that the result of allowing Lee to become a witness without preparation and in his compromised condition was disastrous and resulted in Lee breaking down on the stand, rambling, using profanity, and opening the door to impeachment with a prior conviction for gun possession, which the Court previously had ruled inadmissible.  Blake conceded that allowing Lee to testify under the circumstances was not sound legal strategy, and that the result was "extremely prejudicial" to the defense case.  Evid. Hr'g, ECF No. 226, PageID.2653 ("Q. So it was not sound legal strategy for you to put him on the stand that day without prep; correct? A. I would agree with you. Q. And he also, based on the answers to some of the questions that you asked him on direct, opened the door and Mr. Meixner was able to argue to the Court to allow in the 2005 conviction for felon in possession? A. Correct. Q. And that was extremely prejudicial to his defense; would you agree with me?").

The post-trial evidentiary record conclusively establishes that the performance of Lee's trial counsel was alarmingly deficient and fell far short of reasonable standards of professional norms under the circumstances.   And these instances of deficient performance undermine confidence on the outcome of the trial.  Blake's admitted lapses resulted in the failure to impeach the government's star witness with a damning video record that plainly belied crucial aspects of the officer's testimony.  If Blake had highlighted for the Court (and the jury) the suspicious object that was introduced to the scene by another officer, the Court's and the jury's view of the credibility of Brents's and Lee's contradictory narratives likely would have shifted dramatically.  Pretrial, there would have been a sound basis to question Brents's credibility sufficient to reject his testimony, which would have shifted the analysis of whether there was reasonable suspicion for a pat-down search of the defendant's person.  That could have led to success on the motion to suppress, which would have been fatal to the government's case at trial.

Even if the motion to suppress was not granted, the jury certainly would have had compelling grounds to question Brents's credibility, and that also likely would have weighed heavily in their consideration of the crucial evidence in the case.  Additionally, the impeachment of the defendant with evidence of his prior conviction for weapon possession — the same crime for which he was on trial — certainly had a significant impact on the jury's consideration of the case, and the decision to allow Lee to testify on the stand with inadequate preparation resulted in the admission of the prior conviction which the Court had ruled was unduly prejudicial to the defense.  The admission of the prior conviction almost certainly was the nail in the coffin for Lee's defense, and Blake made no attempt to defend the indefensible decision to allow Lee to take the stand while under the influence and with virtually no effective preparation to testify, which precipitated Lee's calamitous performance.

III.

The defendant's trial counsel's performance fell well below prevailing professional norms for criminal defense practitioners, and it is beyond debate that his failings severely prejudiced the defense.

Accordingly, it is **ORDERED** the defendant's motion to vacate his sentence (ECF No. 103) is **GRANTED**.

It is further **ORDERED** that the verdict of guilty is set aside, the judgment and commitment (ECF No. 86) is **VACATED**, and the case is restored to the active trial docket.

It is further **ORDERED** that the defendant's pretrial bond (ECF No. 9) is **REINSTATED**, and upon release the defendant must report to the Pretrial Services Office in this district for continued pretrial supervision.

It is further **ORDERED** that the amended motion to vacate sentence (ECF No. 107), the motion to exclude and dismiss (ECF No. 118), the motion to vacate sentence and dismiss the indictment (ECF No. 190), and the motion for bond (ECF No. 236) are **DISMISSED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 7, 2025